**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **8:07CR432** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND** |
| | ) | |
| **CHRISTIAN ALVAREZ-MANZO,** | ) | **RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by defendant Christian Alvarez-Manzo (Alvarez-Manzo) (Filing No. 13). Alvarez-Manzo is charged in the Indictment with the distribution and possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). Alvarez-Manzo seeks to suppress evidence obtained by the Nebraska State Patrol (NSP) and the Commercial Interdiction Unit (CIU) from the person and luggage of Alvarez-Manzo on October 31, 2007, at the Greyhound Bus Depot in Omaha, Nebraska.

An evidentiary hearing was held on Alvarez-Manzo's motion on February 15, 2008. Alvarez-Manzo was present for the hearing along with his appointed counsel, Assistant Federal Public Defender Jeffrey L. Thomas. The United States was represented by Assistant U.S. Attorney Nancy A. Svoboda. Laura Garcia-Hein served as an interpreter in the Spanish language for the hearing. During the hearing, the court heard the testimony of NSP Investigators Alan Eberle (Investigator Eberle) and Stephen Rasgorshek (Investigator Rasgorshek). The court also received into evidence an affidavit and application for a search warrant (Exhibit 1), a search warrant with return and inventory (Exhibit 2), a photograph of a claim stub (Exhibit 3), a photograph of a baggage check (Exhibit 4), a photograph of a bus ticket (Exhibit 5), a photograph of a padlock (Exhibit 6), and a photograph of a padlock key (Exhibit 7). A transcript of the hearing (TR.) was filed on February 22, 2008 (Filing No. 26).

**FINDINGS OF FACT**

Investigator Eberle is assigned to the CIU which targets hubs of interstate transportation of persons and parcels to detect criminal activity (TR. 4-5). On October 31, 2007, Investigator Eberle began his shift at 5:00 a.m. at the Omaha Greyhound Bus Depot, located at 16th and Jackson Streets, with other members of the CIU, NSP Investigator Rasgorshek, NSP Investigator Lutter, NSP Investigator Scott, Sergeant Elliott, and DEA Special Agent Orduna (TR. 8). As a bus from Denver arrived at the terminal around 5:30 a.m., the officers observed their usual routine of watching the passengers as the passengers are required to get off the bus and enter the terminal while the bus is cleaned and refueled (TR. 10; 15). Passengers may carry luggage with them off the bus or obtain luggage from the undercarriage storage area of the bus if their destination is Omaha (TR. 10). Initially, none of the passengers or their carry-off luggage piqued the interest of the officers (TR. 10). The Investigators then observed the undercarriage storage area of the bus which had been opened by the bus driver for passengers to obtain luggage or so that luggage could be transferred to another bus (TR. 10-11). The undercarriage of the bus is as wide as the bus and about three-quarters of the length of the bus (TR. 11). The officers observed the luggage as the luggage sat in the undercarriage and as the baggage handlers moved luggage for transfer to another bus or the terminal (TR. 12).

As the middle undercarriage doors were opened, Investigator Eberle's attention was drawn to a newer black Swiss bag (TR. 12). Investigator Eberle used his flashlight to view the bag and tag in the middle bay (TR. 15). Investigator Eberle also noticed the baggage check tag indicating the bag was coming from St. Louis, Missouri destined for Dayton, Ohio (TR. 13). Investigator Eberle testified this was a route not consistent with a bag coming to Omaha (TR. 13). Investigator Eberle noted the words "Indianapolis. IL" were handwritten on the baggage check (TR. 13; Exhibit 4). Investigator Eberle testified this was the first such bag he had seen where the computer generated tag had a different destination in handwriting (TR. 14). Investigator Eberle testified he had been observing bus traffic and baggage for the past six years. Investigator Eberle also noted the bag had an aftermarket padlock affixed (TR. 18; Exhibit 6). Another investigator located another piece of luggage of interest, which was unrelated to this case (TR. 20).

After all the ongoing passengers were reloaded by the bus driver, Investigator Eberle asked the bus driver if Investigator Eberle could find the owners of the two bags in which the officers were interested (TR. 21). The bus driver had not completed his departure routine and told the officers they could make the inquiries (TR. 21). Investigators Eberle, Lutter, and Scott got on the bus (TR. 22). Investigator Eberle stood in the aisle in the front of the bus followed by Investigators Lutter and Scott (TR. 22). Each officer was in plain clothes (TR. 23). The bus was approximately half-full of passengers of its 52 passenger capacity (TR. 23). As Investigator Lutter held up the black suitcase in issue, Investigator Eberle made an announcement to the passengers that the officers were law enforcement officers, that there were no problems and no one was under arrest, and that the officers were attempting to find the owner of the black suitcase being held up which was found in the undercarriage of the bus (TR. 25). None of the passengers responded (TR. 25). Investigator Eberle then read off the origination and destination on the baggage claim as well as the name printed on it, Francisco Perez (TR. 25; Exhibit 4). No passenger responded (TR. 26). Officer Eberle did notice defendant Alvarez-Manzo paid more attention to the suitcase than the other passengers (TR. 28). Alvarez-Manzo seemed to be the only passenger to have an interest in the suitcase based upon Alvarez-Manzo's nonverbal actions (TR. 28). Officer Eberle then told the passengers the officers would go to the rear of the bus and ask each passenger in turn whether or not the suitcase belonged to them and asked the passengers to respond yes or no (TR. 26). Investigator Eberle took the suitcase from Investigator Lutter and walked to the rear of the bus and asked each of the passengers, in turn, whether the bag belonged to them (TR. 28). Receiving negative responses, Investigator Eberle worked his way up the aisle until he reached Alvarez-Manzo at about the middle portion of the bus (TR. 28).

Investigator Eberle asked a female seated next to Alvarez-Manzo if the bag belonged to her (TR. 29). When she responded in the negative, Investigator Eberle asked Alvarez-Manzo if the bag belonged to Alvarez-Manzo (TR. 29). Alvarez-Manzo stated "si" followed by "yes" (TR. 29). Investigator Eberle spoke both English and Spanish with Alvarez-Manzo (TR. 29-30). Investigator Eberle's Spanish is limited to the Spanish he learned while on the job (TR. 29). Investigator Eberle asked Alvarez-Manzo, both in

English and Spanish, if Alvarez-Manzo was Francisco Perez (TR. 30). Alvarez-Manzo responded "si and yes" (TR. 30). Investigator Eberle again asked Alvarez-Manzo if the bag belonged to him, and Alvarez-Manzo said "si and yes" (TR. 30). Investigator Eberle asked Alvarez-Manzo if Alvarez-Manzo could step off the bus so Investigator Eberle could ask some questions about the bag (TR. 30). Alvarez-Manzo stated "si and yes" and stepped in front of Investigator Eberle to walk off the bus (TR. 31). Investigator Eberle, with the bag, followed Alvarez-Manzo off the bus to an unloading area about six feet from the bus door (TR. 32). Investigator Rasgorshek was standing nearby (TR. 33). Investigators Lutter and Scott remained on the bus working the other bag which was unrelated to this case (TR. 33).

Investigator Eberle displayed his credentials to Alvarez-Manzo and explained to Alvarez-Manzo, in English and Spanish, that Investigator Eberle was a police officer, that Alvarez-Manzo was not under arrest or in any kind of trouble, and that Investigator Eberle wanted to ask Alvarez-Manzo some questions about the suitcase (TR. 34). Alvarez-Manzo stated he understood and appeared to have no difficulty understanding Investigator Eberle (TR. 35). Alvarez-Manzo appeared to start breathing heavily and shaking after Investigator Eberle displayed his credentials and Alvarez-Manzo's nervousness appeared to increase as the conversation proceeded (TR. 35-38). When Investigator Eberle again asked Alvarez-Manzo if the suitcase was his and Alvarez-Manzo did not respond, Investigator Eberle asked Alvarez-Manzo for a bus ticket (TR. 36-37). In English, Alvarez-Manzo stated the ticket was on bus (TR. 37). Investigator Eberle asked Alvarez-Manzo if he had any identification on him (TR. 37). Without verbally responding, Alvarez-Manzo reached into his right front pocket and began removing a blue envelope similar to the envelopes Greyhound bus tickets are enclosed (TR. 37). After having partially pulled out the envelope, Alvarez-Manzo replaced the envelope in his pocket and said "no, I don't have any ID with me" (TR. 37). Alvarez-Manzo then turned to reenter the bus (TR. 38). As he did so, Investigator Eberle noticed a bulging wallet in Alvarez-Manzo's rear pocket (TR. 38). Investigator Eberle asked Alvarez-Manzo if his ID was in the wallet (TR. 38). Alvarez-Manzo did not respond verbally, but after the inquiry was repeated by Investigator Eberle, Alvarez-Manzo turned around, walked towards Investigator Eberle, reached into his back pocket, retrieved the wallet, and handed the wallet to Investigator Eberle (TR. 38). As

4

Alvarez-Manzo handed the wallet to Investigator Eberle, Alvarez-Manzo's hand was shaking so much that Alvarez-Manzo almost dropped the wallet (TR. 38-39). Investigator Eberle took the wallet, handed it back to Alvarez-Manzo, and asked Alvarez-Manzo if Investigator Eberle could search the wallet (TR. 39). Alvarez-Manzo replied "si and yes" (TR. 40). Investigator Eberle opened the wallet and saw a baggage tag claim ticket in the name of Francisco Perez (TR. 40; Exhibit 3). Investigator Eberle put the wallet in his coat pocket and placed Alvarez-Manzo in handcuffs (TR. 41). Investigator Eberle explained he handcuffed Alvarez-Manzo to prevent Alvarez-Manzo from fleeing and for officer safety (TR. 41). Investigator Eberle asked Investigator Rasgorshek to take Alvarez-Manzo into the baggage room of the bus terminal (TR. 42). The scheduled departure of the bus was not delayed for these procedures (TR. 22; 44).

Investigator Eberle then retrieved his drug detection canine, Rocky, from his vehicle and took the canine to the baggage room of the bus terminal where Rocky performed a sniff of the black bag (TR. 42; Exhibit 1). Rocky gave a positive indication for the presence of narcotics (TR. 42). Both Investigator Eberle and Rocky were certified as a drug detection team in July of 2007 (TR. 42; Exhibit 1). Upon receipt of Rocky's indication, the bag and Alvarez-Manzo were transported to the NSP traffic office at 108th and I Streets in Omaha (TR. 43). At the NSP traffic office an officer who was fluent is the Spanish language was called in to interview Alvarez-Manzo, but Alvarez-Manzo declined to make a statement (TR. 44). The bag was transported to the Douglas County Sheriff's Office where the bag was subjected to a scan from an ion scanner, a GE Vapor Traser II, which indicated the presence of heroin on the exterior of the bag (Exhibit 1).

Investigator Eberle applied for a search warrant from a County Judge from Douglas County (TR. 46; Exhibit 1). The search warrant application detailed the events which had transpired at the Greyhound Bus Depot, the canine sniff, and the ion scan (Exhibit 1). Thereupon, a search warrant was issued for the black bag and the defendant's person (Exhibit 2). The search warrant was executed and various items were seized including ten kilograms of cocaine (TR. 47; Exhibit 2).

## LEGAL ANALYSIS

5

The defendant argues the evidence obtained on October 31, 2007, during the course of the search of the luggage should be suppressed because the evidence was obtained unlawfully. The defendant argues the investigators unlawfully detained the defendant and the warrantless seizures of himself and the luggage were unlawful and without consent. The defendant contends he was seized at the time the officers instructed them to leave the bus.

### A.   Personal Encounter

Encounters between the police and citizens fall into three general categories:

(1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, **see, e.g., *Florida v. Bostick***, 501 U.S. 429 (1991); ***Florida v. Royer***, 460 U.S. 491 (1983); ***United States v. Tarantola***, 332 F.3d 498, 499 (8th Cir. 2003); ***United States v. Jones***, 269 F.3d 919, 925-26 (8th Cir. 2001); ***United States v. Hathcock***, 103 F.3d 715, 718-19 (8th Cir. 1997); ***United States v. Robinson***, 984 F.2d 911, 913 (8th Cir. 1993);

(2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, **see, e.g., *United States v. Sokolow***, 490 U.S. 1 (1989); ***Reid v. Georgia***, 448 U.S. 438 (1980); ***Terry v. Ohio***, 392 U.S. 1 (1968); ***United States v. Maltais***, 403 F.3d 550, 554 (8th Cir. 2005); ***United States v. Bustos-Torres,*** 396 F.3d 935, 942 (8th Cir. 2005); and

(3) physical arrests, which must be supported by probable cause.  ***U.S. Const. amend. IV.***

The government has the burden to prove the initial encounter was voluntary, or that justification otherwise existed for each increasingly intrusive restraint on the defendant. **See *Missouri v. Seibert***, 124 S. Ct. 2601, 2608 n.1 (2004); ***United States v. Escobar***, 389 F.3d 781, 785 (8th Cir. 2004) ("The government bears the burden of showing consent was freely and voluntary given and not a result of duress or coercion, and the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority."). "The determination of which police-citizen contacts fall within the regulation of the Fourth

Amendment and which do not is a fact intensive one which turns upon the unique facts of each case." **Jones**, 269 F.3d at 925.  The government admits the initial encounter was not consensual and asserts the contact was an investigatory detention.

"It is well established, of course, that a law enforcement officer may detain a person for investigation without probable cause to arrest if the officer 'has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" **United States v. Maltais**, 403 F.3d 550, 554 (8th Cir. 2005) (**quoting United States v. Sokolow**, 490 U.S. 1, 7 (1989) (internal quotation and citation omitted)).  "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." **United States v. Garcia**, 23 F.3d 1331, 1334 (8th Cir. 1994).  "[A]n officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation to provide justification for a stop." **United States v. Ortiz-Monroy**, 332 F.3d 525, 529 (8th Cir. 2003).  Officers may continue the detention for a reasonable period to verify or dispel the suspicion.  **Maltais**, 403 F.3d at 556.  However, a detention may become a *de facto* arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention.  **Id**. (**citing United States v. Sharpe**, 470 U.S. 675, 685 (1985)).  In determining whether a period of time is excessive, the court must consider the "law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." **Sharpe**, 470 U.S. at 685; **United States v. Bloomfield**, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (holding one-hour detention upon reasonable suspicion to wait for a drug dog was reasonable).

The issue is whether the initial contact between law enforcement and the defendant was a purely consensual encounter or an investigatory detention or seizure.  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons." **Terry**, 392 U.S. at 19 n.16.  A seizure does not occur when a police officer approaches an individual and merely questions him or asks to examine his identification -- so long as the officer does not convey a message that compliance with his request is required.  **Bostick**, 501 U.S. at 434; **see also United States v. Drayton**, 536 U.S. 194, 200-01 (2002).  If "a reasonable person would feel free 'to disregard the police and go about his business,'" the

7

encounter is consensual and no reasonable suspicion is required.  *Id*. (**quoting** *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).  "It is well established that law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . [and] putting questions to him if the person is willing to listen." *United States v. Green*, 52 F.3d 194, 198 (8th Cir. 1995) (citations omitted).  A request for information does not turn consensual questioning into an investigatory stop. *United States v. Pena-Saiz*, 161 F.3d 1175, 1177 (8th Cir. 1998); *United States v. Poitier*, 818 F.2d 679, 682-83 (8th Cir. 1987).  Further, as long as a defendant was not selected for an approach for any purely discriminatory reasons, e.g., race or ethnicity, the fact law enforcement chose to approach a particular defendant is without constitutional implication.

In this case, the officers made observations about the luggage which raised their suspicions about drug trafficking.  Based on such observations, the officers attempted to make contact with the owner of the luggage.  The officers ultimately determined the defendant was the owner based on his verbal assurance that he was the owner and based on his body language.  The officers made contact with the defendant and asked him to step off of the bus.  The defendant agreed to do so.  The defendant also voluntarily provided his wallet and the baggage claim ticket to Investigator Eberle.

The defendant's encounter with the officers remained a consensual encounter until the time when the defendant was placed in hand cuffs.  Until that time, the defendant engaged in deceptive behavior, acted unusually nervous and at one point walked away from the officers.  Courts have held evasive and erratic behavior can contribute to a finding of reasonable suspicion.  *United States v. Turpin*, 920 F.2d 1377, 1385 (8th Cir. 1990) (suspect exhibited erratic behavior and "alarm" after seeing police officers); *United States v. Montero-Camargo*, 208 F.3d 1122, 1136-37 (9th Cir. 2000) (suspect took evasive and erratic path in an apparent attempt to avoid police, which was relevant to reasonable suspicion analysis).  Furthermore, the Supreme Court has held "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. The officers were justified in the temporary investigatory detention of the defendant based on the unusual conduct.

The duration of the detention was brief before Investigator Eberle retrieved Rocky, who was nearby, to conduct a sniff of the luggage. Accordingly, the court finds the detention was not unreasonably long. Once Rocky was retrieved, he gave a positive indication for the presence of narcotics. Assuming the "dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present." **United States v. Donnelly**, 475 F.3d 946, 955 (8th Cir. 2007). Based upon Rocky's indication, the officers had probable cause to further detain the luggage and seek a search warrant.

"The duty of the judge issuing a search warrant is to make a 'practical, common-sense decision' whether, considering all the circumstances, a reasonable person could have reason to suspect that evidence would be discovered. . . . Probable cause is a fair probability that contraband evidence of a crime will be found in the location to be searched." **United States v. LaMorie**, 100 F.3d 547, 552 (8th Cir. 1996); see **Illinois v. Gates**, 462 U.S. 213, 238 (1983). The court notes there is ample evidence supporting the probable cause finding in the search warrant, specifically the indication by Rocky and ion scan results. See **United States v. Sundby**, 186 F.3d 873, 876 (8th Cir. 1999) (noting a dog's reliability to be described in the affidavit). Under these circumstances, the court finds reliance on the search warrant was reasonable under the **Leon** good faith exception. **United States v. Leon**, 468 U.S. 897 (1984). Because the defendant admitted ownership of the luggage and had a baggage claim stub matching the baggage check tag, the officers had probable cause to detain the defendant.

**IT IS RECOMMENDED TO CHIEF JUDGE JOSEPH F. BATAILLON that:**

Alvarez-Manzo's motion to suppress (Filing No. 13) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such

objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 11th day of April, 2008.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge