IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:07CR432 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| CHRISTIAN ALVAREZ-MANZO, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the defendant's objections, Filing No. 32, and the United States' objection, Filing No. 28, to the report and recommendation ("R&R") of the magistrate judge, Filing No. 27. Defendant filed a motion to suppress, Filing No. 13, and the magistrate judge recommended the defendant's motion be denied. Pursuant to 28 U.S.C. § 636(b)(1)(A), the court has conducted a *de novo* determination of those portions of the R&R to which the parties object. *United States v. Lothridge*, 324 F.3d 599, 600-01 (8th Cir. 2003). The court has carefully reviewed the entire record including the transcript of the suppression hearing, Filing No. 26, the briefs, and the relevant caselaw. The court finds that the defendant's objections and the United States' objection to the R&R are sustained.

## BACKGROUND

The court accepts the facts set out in the R&R, and reiterates them below:

> Investigator Eberle is assigned to the CIU [Commercial Interdiction Unit] which targets hubs of interstate transportation of persons and parcels to detect criminal activity (TR. 4-5). On October 31, 2007, Investigator Eberle began his shift at 5:00 a.m. at the Omaha Greyhound Bus Depot, located at 16th and Jackson Streets, with other members of the CIU, NSP [Nebraska State Patrol] Investigator Rasgorshek, NSP Investigator Lutter, NSP

Investigator Scott, Sergeant Elliott, and DEA Special Agent Orduna (TR. 8). As a bus from Denver arrived at the terminal around 5:30 a.m., the officers observed their usual routine of watching the passengers as the passengers are required to get off the bus and enter the terminal while the bus is cleaned and refueled (TR. 10; 15).  Passengers may carry luggage with them off the bus or obtain luggage from the undercarriage storage area of the bus if their destination is Omaha (TR. 10).  Initially, none of the passengers or their carry-off luggage piqued the interest of the officers (TR. 10).  The Investigators then observed the undercarriage storage area of the bus which had been opened by the bus driver for passengers to obtain luggage or so that luggage could be transferred to another bus (TR. 10-11).  The undercarriage of the bus is as wide as the bus and about three-quarters of the length of the bus (TR. 11).  The officers observed the luggage as the luggage sat in the undercarriage and as the baggage handlers moved luggage for transfer to another bus or the terminal (TR. 12).

     As the middle undercarriage doors were opened, Investigator Eberle's attention was drawn to a newer black Swiss bag (TR. 12).  Investigator Eberle used his flashlight to view the bag and tag in the middle bay (TR. 15). Investigator Eberle also noticed the baggage check tag indicating the bag was coming from St. Louis, Missouri destined for Dayton, Ohio (TR. 13). Investigator Eberle testified this was a route not consistent with a bag coming to Omaha (TR. 13). Investigator Eberle noted the words "Indianapolis. IL" were handwritten on the baggage check (TR. 13; Exhibit 4).  Investigator Eberle testified this was the first such bag he had seen where the computer generated tag had a different destination in handwriting (TR. 14). Investigator Eberle testified he had been observing bus traffic and baggage for the past six years.  Investigator Eberle also noted the bag had an aftermarket padlock affixed (TR. 18; Exhibit 6). Another investigator located another piece of luggage of interest, which was unrelated to this case (TR. 20).

     After all the ongoing passengers were reloaded by the bus driver, Investigator Eberle asked the bus driver if Investigator Eberle could find the owners of the two bags in which the officers were interested (TR. 21).  The bus driver had not completed his departure routine and told the officers they could make the inquiries (TR. 21).  Investigators Eberle, Lutter, and Scott got on the bus (TR. 22).  Investigator Eberle stood in the aisle in the front of the bus followed by Investigators Lutter and Scott (TR. 22).  Each officer was in plain clothes (TR. 23).  The bus was approximately half-full of passengers of its 52 passenger capacity (TR. 23).  As Investigator Lutter held up the black suitcase in issue, Investigator Eberle made an announcement to the passengers that the officers were law enforcement officers, that there were no problems and no one was under arrest, and that the officers were attempting to find the owner of the black suitcase being held up which was found in the undercarriage of the bus (TR. 25).  None of the passengers

2

responded (TR. 25). Investigator Eberle then read off the origination and destination on the baggage claim as well as the name printed on it, Francisco Perez (TR. 25; Exhibit 4). No passenger responded (TR. 26). Officer Eberle did notice defendant Alvarez-Manzo paid more attention to the suitcase than the other passengers (TR. 28). Alvarez-Manzo seemed to be the only passenger to have an interest in the suitcase based upon Alvarez-Manzo's nonverbal actions (TR. 28). Officer Eberle then told the passengers the officers would go to the rear of the bus and ask each passenger in turn whether or not the suitcase belonged to them and asked the passengers to respond yes or no (TR. 26). Investigator Eberle took the suitcase from Investigator Lutter and walked to the rear of the bus and asked each of the passengers, in turn, whether the bag belonged to them (TR. 28). Receiving negative responses, Investigator Eberle worked his way up the aisle until he reached Alvarez-Manzo at about the middle portion of the bus (TR. 28).

Investigator Eberle asked a female seated next to Alvarez-Manzo if the bag belonged to her (TR. 29). When she responded in the negative, Investigator Eberle asked Alvarez-Manzo if the bag belonged to Alvarez-Manzo (TR. 29). Alvarez-Manzo stated "si" followed by "yes" (TR. 29). Investigator Eberle spoke both English and Spanish with Alvarez-Manzo (TR. 29-30). Investigator Eberle's Spanish is limited to the Spanish he learned while on the job (TR. 29). Investigator Eberle asked Alvarez-Manzo, both in English and Spanish, if Alvarez-Manzo was Francisco Perez (TR. 30). Alvarez-Manzo responded "si and yes" (TR. 30). Investigator Eberle again asked Alvarez-Manzo if the bag belonged to him, and Alvarez-Manzo said "si and yes" (TR. 30). Investigator Eberle asked Alvarez-Manzo if Alvarez-Manzo could step off the bus so Investigator Eberle could ask some questions about the bag (TR. 30). Alvarez-Manzo stated "si and yes" and stepped in front of Investigator Eberle to walk off the bus (TR. 31). Investigator Eberle, with the bag, followed Alvarez-Manzo off the bus to an unloading area about six feet from the bus door (TR. 32). Investigator Rasgorshek was standing nearby (TR. 33). Investigators Lutter and Scott remained on the bus working the other bag which was unrelated to this case (TR. 33).

Investigator Eberle displayed his credentials to Alvarez-Manzo and explained to Alvarez-Manzo, in English and Spanish, that Investigator Eberle was a police officer, that Alvarez-Manzo was not under arrest or in any kind of trouble, and that Investigator Eberle wanted to ask Alvarez-Manzo some questions about the suitcase (TR. 34). Alvarez-Manzo stated he understood and appeared to have no difficulty understanding Investigator Eberle (TR. 35). Alvarez-Manzo appeared to start breathing heavily and shaking after Investigator Eberle displayed his credentials and Alvarez-Manzo's nervousness appeared to increase as the conversation proceeded (TR. 35-38). When Investigator Eberle again asked Alvarez-Manzo if the suitcase

was his and Alvarez-Manzo did not respond, Investigator Eberle asked Alvarez-Manzo for a bus ticket (TR. 36-37).  In English, Alvarez-Manzo stated the ticket was on bus (TR. 37).  Investigator Eberle asked Alvarez-Manzo if he had any identification on him (TR. 37).  Without verbally responding, Alvarez-Manzo reached into his right front pocket and began removing a blue envelope similar to the envelopes Greyhound bus tickets are enclosed (TR. 37).  After having partially pulled out the envelope, Alvarez-Manzo replaced the envelope in his pocket and said "no, I don't have any ID with me" (TR. 37).  Alvarez-Manzo then turned to reenter the bus (TR. 38).  As he did so, Investigator Eberle noticed a bulging wallet in Alvarez-Manzo's rear pocket (TR. 38).  Investigator Eberle asked Alvarez-Manzo if his ID was in the wallet (TR. 38).  Alvarez-Manzo did not respond verbally, but after the inquiry was repeated by Investigator Eberle, Alvarez-Manzo turned around, walked towards Investigator Eberle, reached into his back pocket, retrieved the wallet, and handed the wallet to Investigator Eberle (TR. 38).  As Alvarez-Manzo handed the wallet to Investigator Eberle, Alvarez-Manzo's hand was shaking so much that Alvarez-Manzo almost dropped the wallet (TR. 38-39).  Investigator Eberle took the wallet, handed it back to Alvarez-Manzo, and asked Alvarez-Manzo if Investigator Eberle could search the wallet (TR. 39).  Alvarez-Manzo replied "si and yes" (TR. 40).  Investigator Eberle opened the wallet and saw a baggage tag claim ticket in the name of Francisco Perez (TR. 40; Exhibit 3).  Investigator Eberle put the wallet in his coat pocket and placed Alvarez-Manzo in handcuffs (TR. 41).  Investigator Eberle explained he handcuffed Alvarez-Manzo to prevent Alvarez-Manzo from fleeing and for officer safety (TR. 41).  Investigator Eberle asked Investigator Rasgorshek to take Alvarez-Manzo into the baggage room of the bus terminal (TR. 42).  The scheduled departure of the bus was not delayed for these procedures (TR. 22; 44).

   Investigator Eberle then retrieved his drug detection canine, Rocky, from his vehicle and took the canine to the baggage room of the bus terminal where Rocky performed a sniff of the black bag (TR. 42; Exhibit 1).  Rocky gave a positive indication for the presence of narcotics (TR. 42).  Both Investigator Eberle and Rocky were certified as a drug detection team in July of 2007 (TR. 42; Exhibit 1).  Upon receipt of Rocky's indication, the bag and Alvarez-Manzo were transported to the NSP traffic office at 108th and I Streets in Omaha (TR. 43).  At the NSP traffic office an officer who was fluent is the Spanish language was called in to interview Alvarez-Manzo, but Alvarez-Manzo declined to make a statement (TR. 44).  The bag was transported to the Douglas County Sheriff's Office where the bag was subjected to a scan from an ion scanner, a GE Vapor Traser II, which indicated the presence of heroin on the exterior of the bag (Exhibit 1).

   Investigator Eberle applied for a search warrant from a County Judge from Douglas County (TR. 46; Exhibit 1).  The search warrant application

4

detailed the events which had transpired at the Greyhound Bus Depot, the canine sniff, and the ion scan (Exhibit 1). Thereupon, a search warrant was issued for the black bag and the defendant's person (Exhibit 2). The search warrant was executed and various items were seized including ten kilograms of cocaine (TR. 47; Exhibit 2).

Additionally the court notes the following facts. The luggage hold was not full. It contained approximately five to seven bags, two of which were identified as "suspect" (TR15-16). When the three investigators questioned the bus passengers about the two pieces of luggage one was stationed at the front of the bus, near the drivers seat. The investigator near the front of the bus stopped ingress and egress from the bus as well as providing officer safety (TR22).

## DISCUSSION

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. Clearly, "[t]he Fourth Amendment protects against both unreasonable searches and unreasonable seizures." *Id.* The defendant asserts that the officers did not have a "reasonable articulable suspicion of criminal activity" to justify the officers' removal of his bag from the baggage compartment under the bus and that the officers have a familiarity with the bus personnel which results in the bus personnel allowing the officers to control the luggage and departure process resulting in a seizure of the luggage. The defendant further asserts that the officers seized him without a warrant, without reasonable suspicion to detain, and without probable cause to arrest. The United States' position is that the officers did not "seize" the defendant's luggage and that the initial

encounter between the defendant and the officers was consensual, not an investigatory detention.[1]

**Seizure of the Luggage**

The Fourth Amendment protects an individual's privacy interests in the contents of personal luggage. *United States v. Place*, 462 U.S. 696, 707 (1983); *United States v. Gwinn*, 191 F.3d 874, 878 (8th Cir. 1999). Bus passengers obviously expect that their checked bags will be handled. *Bond v. United States,* 529 U.S. 334, 338 (2000). Consequently, not every interference with an individual's luggage constitutes a search or a seizure within the meaning of the Fourth Amendment. *Gwinn*, 191 F.3d at 878. A seizure occurs only when law enforcement "'meaningfully interfere[s]'" with an individual's possessory interests in the property. *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005) (en banc) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Courts focus on three factors when considering whether law enforcement's interference with checked luggage constitutes a seizure. "First, did law enforcement's detention of the checked luggage delay a passenger's travel or significantly impact the passenger's freedom of movement? Second, did law enforcement's detention of the checked luggage delay its timely delivery? Third, did law enforcement's detention of the checked luggage deprive the carrier of its custody of the checked luggage?" *Va Lerie*, 424 F.3d at 707. If any one of these conditions occurs, the government must show that there was sufficient information at the time of the seizure for a reasonable officer to suspect that

---

[1] The court sustains the United States' objection to the magistrate judge's factual statement in the R&R that the United States admitted that the initial encounter was nonconsensual and that it was an investigatory detention. The United States' position has consistently been that the initial encounter was consensual.

the luggage contained contraband or evidence of illegal activity. *See id.*; *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004).

With respect to the first factor the evidence supports the defendant's contention that the officers detention of the luggage significantly impacted the defendant's freedom of movement. At the time the officers entered the bus with Alvarez-Manzo's luggage, the bus was preparing to depart. The officers boarded the bus and announced that they were looking for the owner of certain luggage. Alvarez-Manzo was not free to leave the bus, for to do so, he would have had to leave the luggage with the officers and would have risked missing the next leg of his journey. Additionally, the officers' removal of Alvarez-Manzo's checked luggage from the bus's luggage compartment to inside the bus to seek consent to search constitutes a meaningful interference with Alvarez-Manzo's possessory interests in his luggage. There was no indication as to what the officers intended to do with this luggage, the length of time that they intended to hold on to it, or whether the luggage would be returned to the owner once the owner was identified. There is no evidence that Greyhound personnel approved the removal of the luggage from the undercarriage of the bus, and no Greyhound personnel was present on the bus when the officers were questioning the passengers. Therefore, the officers' removal and possession of the defendant's luggage was a seizure.

Because the court has determined that the officers meaningfully interfered with the defendant's possessory interest in the luggage, the government must show that reasonable suspicion existed in order to detain a person's luggage and it must derive from more than a hunch. *United States v. Tillman*, 81 F.3d 773, 775 (8th Cir. 1996). A warrantless seizure and detention of packages or luggage being transported by third parties such as

7

Greyhound is permissible only if the officers have a reasonable and articulable suspicion of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 20-23 (1968); *Place*, 462 U.S. at 708. In analyzing the problem from a totality of the circumstances approach, the officers did not have reasonable suspicion, much less probable cause, to remove the bag and detain it.

Eberle testified that his attention was drawn to the defendant's bag because it was new and because it had no handwritten name tag.  Lack of a name tag alone does not create probable cause or even reasonable suspicion, *United States v. Gwinn,* 191 F.3d 874, 879 n.5 (8th Cir. 1999) (observing that "[m]any passengers do not place name tags on their luggage, particularly carry-on luggage"), particularly since the defendant's bag did have a Greyhound luggage tag.  Nor could the "newness" of the defendant's bag alone have provoked reasonable suspicion, since all bags are, at some point, "new."  Eberle did not testify that he noticed any unusual bulges, bumps, or smells coming from the bag. Eberle did testify that the luggage had an after-market padlock, which the court finds to be expected for one checking luggage on a bus.  Eberle did testify that Greyhound's luggage claim ticket caused him concern because it did not match the route; however, at most that indicates a problem with Greyhound's luggage process, not a problem that was the result of an act of the passenger.

The Eighth Circuit has consistently found detentions based on interdiction "indicators" unjustified due to a lack of reasonable suspicion. *See United States v. Tovar-Valdivia,* 193 F.3d 1025, 1028 (8th Cir. 1999); *United States v. White,* 890 F.2d 1413, 1419 (8th Cir. 1989); *United States v. Fletcher,* 91 F.3d 48, 51 (8th Cir. 1996); *United States v. Eustaquio,* 198 F.3d 1068, 1071 (8th Cir. 1999); *United States v. Jones,* 254 F.3d 692, 697 (8th Cir. 2001); *United States v. O'Neal,* 17 F.3d 239, 242 (8th Cir. 1994); *United States v.*

*Green,* 52 F.3d 194, 200 (8th Cir. 1995). In assessing whether the requisite degree of suspicion exists, the court must determine whether the facts collectively establish reasonable suspicion. *United States v. Beck,* 140 F.3d at 1129, 1136 (8th Cir. 1998). "A combination of wholly innocent factors cannot combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Id*. The factors giving rise to the investigators' suspicions are typical of the innocent behavior of a broad category of people. "[C]onduct typical of a broad category of innocent people provides a weak basis for suspicion." *United States v. Weaver,* 966 F.2d 391, 394 (8th Cir. 1992), citing *United States v. Crawford* , 891 F.2d 680, 681 (8th Cir. 1989); *see also Reid v. Georgia,* 448 U.S. 438, 441 (1980) (per curiam). When considered under the totality of the circumstances, the investigators' observations did not amount to reasonable suspicion and could not justify the seizure of the bag.

**Seizure of the Defendant's Person**

Under the Fourth Amendment, probable cause justifies a seizure. *See Whren v. United States,* 517 U.S. 806 (1996). Probable cause for a warrantless arrest "depends . . . upon whether, at the moment the arrest was made, . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91 (1964). *See also Kuehl v. Burtis,* 173 F.3d 646 (8th Cir.1999); *United States v. Neumann,* 585 F.2d 355 (8th Cir. 1978). The parties both agree that the defendant was seized once he was placed in handcuffs. However, in addition to a formal arrest, a person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the

9

officer, "'by means of physical force or show of authority,'" terminates or restrains his freedom of movement, *Florida v. Bostick,* 501 U.S. 429, 434 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968)), "*through means intentionally applied,*" *Brower v. County of Inyo,* 489 U.S. 593, 597 (1989) (emphasis in original).

A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned. *Brendlin v. California,* 127 S. Ct. 2400, 2405 (2007), citing *California v. Hodari D.*, 499 U.S. 621, 626, n.2 (1991).

A seizure occurs if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554 (1980). The "coercive effect of the encounter" can be measured better by asking whether "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter," *Bostick, supra*, at 435-436.

In *Bostick*, the United States Supreme Court reviewed a Florida Supreme Court finding that all encounters on a bus had to be *per se* coercive because of the confines of the bus and the inability to leave the bus for fear of the bus departing. The Court held that "[t]he cramped confines of a bus are one relevant factor that should be considered in evaluating whether a passenger's consent is voluntary." *Id*. at 439. However, "in order to determine whether a particular encounter constitutes a seizure, a court must consider all of the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id*.

The test for determining the validity of consent is whether the consent is given voluntarily and without coercion. *United States v. Briley,* 726 F.2d 1301 (8th Cir. 1984). Consent is voluntary if it is the "product of an essentially free and unconstrained choice" and not "the product of duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 227 (1973). The court must inquire "whether the officers did anything to affirmatively communicate to the defendant that she was not free to terminate the encounter or to refuse the consent request." *United States v. Zamoran-Coronel,* 231 F.3d 466, 469 (8th Cir. 2000).

The officers' conduct repeatedly showed Alvarez-Manzo that he had no choice but to comply with their "requests" and that he was not free to terminate the encounter. When the officers entered the bus, the defendant chose not to identify his luggage or to interact with the officers. When he failed to do so, the officers did not return the luggage to Greyhound but instead they went from person-to-person to inquire as to who owned the luggage. Only when the officer specifically asked the defendant if the luggage was his, giving him no choice but to give the officer a yes or no answer, did the defendant say "si" and "yes" that the luggage was his. The defendant did not have an opportunity to refuse to talk to the officers—because their behavior demanded an answer to their question. The officer then repeated the question, demanding confirmation that the luggage was the defendant's.[2]

After this protracted procedure to locate the owner of the luggage, the officer requested that the defendant leave the bus to discuss the luggage. The defendant was not

---

[2] The fact that the officer repeated the question concerns the court that the officer wasn't sure that the defendant understood enough English, or the officer's limited Spanish, to understand what the officer was asking of the defendant.

given the option to remain on the bus and have his luggage returned to him. When they exited the bus, they were joined by a second officer. The officer continued to maintain custody of the luggage and questioned the defendant regarding his itinerary. Despite the fact that the officer had asked the question twice on the bus, the officer again asked if the luggage belonged to the defendant. This time the defendant did not respond. The officer then requested identification from the defendant. After responding that he did not have any identification on him, the defendant attempted to re-board the bus, but was asked by the officer to return. The officer asked for the defendant's wallet, which the defendant handed over without a comment. The wallet then was searched. Once it was determined that a bus ticket in the wallet matched the claim ticket, the defendant was placed in handcuffs. The record shows that the officer maintained control of the defendant's luggage during this entire encounter.

While the government argues that the arrest was supported by the defendant's nervous behavior, this behavior occurred after he was illegally seized from the bus and, moreover, a suspect's nervousness, by itself, has been widely scrutinized as a factor for developing reasonable suspicion. *See United States v. Beck,* 140 F.3d 1129, 1139 (8th Cir. 1998) (finding that suspicion associated with nervous behavior is at best minimal); *White*, 890 F.2d at 1418 (finding that becoming nervous when confronted by officers is not uncommon); *Reid v. Georgia,* 448 U.S. 438, 441 (1980) (finding that nervous conduct does not support a finding of reasonable suspicion).

Because the court has determined that removal of the defendant from the bus was a custodial interrogation, all statements made by the defendant are inadmissible. "A *Miranda* warning must precede any custodial interrogation. A custodial interrogation

involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir.1999) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)).

**Search of the Defendant's Wallet**

The defendant also alleges that he did not voluntarily provide his wallet to the officers. Challenged evidence is admissible if (1) the consent was voluntarily given, and (2) the consent was "an independent act of free will." *United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). The first prong of this test examines whether the defendant was coerced; the second prong examines whether the alleged consent was causally connected to the constitutional violation. *Id.* The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given. *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (*citing United States v. White*, 81 F.3d 775, 780 (8th Cir. 1996)).

To determine the first prong, that is, whether a defendant voluntarily consented to a search, the court must consider the defendant's "age, intelligence, intoxication, advice of *Miranda* rights, and previous arrests." *United States v. Reinholz*, 245 F.3d 765, 780 (8th Cir.), *cert. denied*, 534 U.S. 896 (2001) (*citing United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990)). The court also considers the environment in which the consent was allegedly given, looking at the length of detention, any threats or misrepresentations by police, whether the suspect was in custody or under arrest, whether the place where the arrest occurred was public or private, and whether the suspect made any contemporaneous objections or representations. *Id*.

Alvarez-Manzo was in custody at the time he was removed from the bus. He had already informed the officer that he did not have his identification, however, the officers requested additional information from him, while retaining possession of his luggage. Given the coercive nature of the interaction between the officers and the defendant, the court finds that the defendant did not voluntary give his consent to search his wallet.

**Subsequent Search Warrant**

The United States contends that the search warrant was sufficient to provide grounds for the subsequent search of the defendant's luggage. The "fruit of the poisonous tree" refers to indirect or secondary evidence obtained as a result of a prior illegality. *See Nardone v. United States,* 308 U.S. 338, 341 (1939) (coining the phrase for the first time). Under the doctrine, the "fruits" of the prior illegality are excluded if they were an exploitation of that prior illegality. *See Wong Sun v. United States,* 371 U.S. 471, 487- 88 (1963). The illegal seizure of the defendant and his luggage taints the subsequent search warrant. Consequently, the evidence obtained in the search after the illegal seizure of the defendant and his luggage is "fruit from a poisonous tree." For these reasons, the defendant's motion to suppress the evidence is granted.

**Totality of the Circumstances**

This court is mindful of the increased intrusiveness of luggage search and seizure, and of bus passenger detention and interrogation authorized by *Va Lerie, supra*, and its related family of cases. However, until Congress or the Courts decree there is no expectation of the random search or seizure of luggage for travelers on buses and trains, the Constitutional protections afforded them under the Fourth Amendment must apply. In the instant case officers removed the defendant's bag from the luggage compartment,

carried it inside the passenger compartment, and, bag in hand, individually asked each passenger to identify the bag. In *Va Lerie* the bag was sequestered by law enforcement in a separate holding room. The bag was on bus property located in a room adjacent to the baggage holding area. Officers made contact with Mr. Va Lerie while he was in the public terminal area before his scheduled departure. He consented to follow the officers to the sequestered luggage area to answer questions about his luggage. There he consented to its search.

Here there is not even the pretext that the luggage is in Greyhound custody and control. The officers have it in hand, in their sole custody and control. They ask passengers to identify the bag with the sole purpose of obtaining consent to search the bag. If they do not obtain that consent they may, at their discretion, handcuff and detain the passenger, search the passenger's wallet, hold the bag further for a dog sniff, obtain a search warrant, and search the bag. These facts distinguish the instant case from *Va Lerie*. In fact, the *Va Lerie* court recognized this distinction at foot note 9 when it stated: "Had the NSP [Nebraska State Patrol] exerted dominion over Va Lerie's luggage such that it deprived Greyhound of its custody of the luggage, then a seizure would have occurred." *Va Lerie*, 424 F.3d at 709, n.9.

Viewed in the totality of the circumstances the seizure and arrest of Mr. Alverez and his luggage represents an incremental but significant step toward complete abrogation of his and all passenger rights against unreasonable search, seizure and detention. The court finds that this incremental step is outside the bounds set by the United States Constitution.

THEREFORE, IT IS ORDERED:

1. The motion to suppress, Filing No. 13, is granted;

2. Defendant's objections, Filing No. 32, are sustained;

3. The United States' objection, Filing No. 28, is sustained;

4. The magistrate judge's report and recommendation, Filing No. 27, is not adopted.

DATED this 3rd day of July, 2008.

BY THE COURT:

s/ Joseph F. Bataillon
Chief United States District Judge